State Real Estate Commission, Appellant, *v.*
Tice.

554

Argued March 11, 1963. Before RHODES, P. J., ERVIN, WRIGHT, WOODSIDE, WATKINS, MONTGOMERY, and FLOOD, JJ.

*Morris J. Dean*, Deputy Attorney General, with him *Walter E. Alessandroni*, Attorney General, for Commonwealth, appellant.

*Richard R. Lefever*, with him *Samuel A. Schreckengaust, Jr.*, and *McNees, Wallace & Nurick*, for appellee.

OPINION BY ERVIN, J., April 18, 1963:

This is an appeal from the order of the court below setting aside a revocation by the State Real Estate Commission of appellee's real estate broker's license.

The commission found that the appellee, Tice, in arranging the sale of his own property, was guilty of violating §10(a, 1) of the Real Estate Brokers License Act of May 1, 1929, P. L. 1216, as amended, 63 PS §440, in that he was guilty of knowingly making substantial misrepresentations; and also of subsection (7) in that he was guilty of acts or conduct in connection with a real estate transaction which demonstrated incompetency, bad faith or dishonesty.

Tice drew up a sales agreement dated October 5, 1956 covering a newly constructed residence in the Easton area, which he and his wife agreed to sell to John W. Bartron and Florence P. Bartron, his wife, for the sum of $14,700.00. The agreement also provided for a down payment of $1,200.00 on the signing of the agreement and a further sum of $1,800.00 in cash on or before November 5, 1956. The balance of $11,700.00 was to be covered by an FHA mortgage for a period of thirty years. The Bartrons also agreed to pay the further sum of $300.00 on account of settlement costs. The agreement also provided that possession was to be given when the down payment of $3,000.00 had been made. Notwithstanding the agreement, the Bartrons were permitted to go into possession immediately upon paying the $1,200.00 and signing the agreement of sale.

The parties agreed that the Bartrons were to pay $100.00 a month for eight months. Tice agreed to loan the Bartrons the remaining $1,000.00 of the down payment and to cover settlement costs on the security of a judgment note, which he took from the Bartrons in the sum of $2,000.00. The Bartrons had advised Tice that they had only $1,200.00 cash for the down payment. Tice advised the Bartrons that would be sufficient to enable them to make the purchase.

Tice sought to obtain the FHA insured mortgage provided for in the agreement of sale in March 1957,

approximately six months after the execution of the agreement of sale. A meeting was arranged between the purchasers and an officer of Phillipsburg Trust Company for the purpose of preparing an application to FHA to qualify the Bartrons as eligible insured mortgagors. In accordance with the FHA regulations[1] the Bartrons were asked a series of questions to determine whether or not the funds used to pay both the down payment of $3,000.00 and the settlement costs of $300.00 specified in the agreement of sale, had been financed.

To implement the down payment requirement various procedures are employed by FHA. Before approving a mortgage insurance application, FHA requires the prospective mortgagor to execute a form entitled "Supplement to Mortgagee's Application, and Mortgagor's Statement," sometimes referred to as FHA Form No. 2004(c). This form requires all costs and settlement expenses of the purchase to be itemized and the amount of cash invested by the mortgagor to be specified. With respect to this cash investment, the form asks the following questions: "Have you incurred or do you intend to incur any indebtedness, secured or unsecured, other than that of the mortgage loan applied for, for any purpose connected with this transaction . . . ☐ Yes ☐ No. If Answer is 'Yes' give complete

---

[1] The Act of June 27, 1934, c. 847, Title II, §203, 48 Stat. 1248, 12 U.S.C.A. §1709.

24 CFR Housing and Housing Credit §203.19.

24 CFR Housing and Housing Credit §203.32.

"A mortgagor must establish that after the mortgage offered for insurance has been recorded, the mortgaged property will be free and clear of all liens other than such mortgage and that there will not be outstanding any other unpaid obligation contracted in connection with the mortgage transaction or the purchase of the mortgaged property, except obligations which are secured by property or collateral owned by the mortgagor independently of the mortgaged property."

details, including description of any security offered
......................................."

The prohibition against financing the down payment is also enforced by requiring the borrower to execute a certification of the type given by the purchasers in the instant case. The certification which they signed provided as follows: "This is to certify that the cash payment of $3,000.00 that we made to Howard R. Tice represented:

"Cash on hand and in supplemental funds

"In making the above statement, we are aware of the conditions as outlined in Section #512(a) of the National Housing Act as it appears on the FHA application that we signed namely Form #2004."

Should any representations concerning the down payment be falsely made in the certification or application, §1010 of Title 18, U.S.C.A.[2] is applicable. This section makes it a crime for any person to make any false statement in applying for FHA mortgage insurance or to "aid or abet" such action.[3]

Tice, who had earlier directed the Bartrons "not to say anything" at this meeting, falsely answered these questions on their behalf. He stated that all of the amounts in question had been paid to him by the Bartrons, in cash, out of assets on hand. In addition, he submitted a certification as to the source of funds required by FHA, duly signed by the Bartrons. Following this meeting the Bartrons, without the knowledge of Tice, talked to the bank officer in order to correct the misstatements which had been made at the meeting. Their application for the FHA mortgage was disapproved. About six months thereafter Tice arranged a second mortgage application meeting for the Bartrons at the Easton Trust Company. Without giving the de-

---

[2] The Act of June 25, 1948, c. 645, 62 Stat. 751.

[3] *U.S. v. Hawkins*, 295 F. 2d 837 (6th Cir. 1961).

tails of this second attempt to secure an FHA mortgage, suffice it to say that it did not go through because the Bartrons refused to sign a new agreement of sale for the purchase of the property and refused, upon the advice of their attorney, to be a party to any further attempt to circumvent the FHA regulations.

We are convinced that the record in this case clearly reveals that Tice purposely endeavored to sell his own property with secondary financing of a portion of the down payment and settlement costs, contrary to the statutes and regulations governing FHA mortgage insurance transactions. There can be no doubt that he made substantial misrepresentations to the bank officer concerning this transaction and there can be no doubt that he endeavored to induce the Bartrons to make misstatements in the form which they were required to sign.

Counsel for Tice argues that there was not adequate proof to show that these representations were "knowingly" made, as is required by the specific terms of the act above referred to. The record shows that Tice has been a broker since 1936 and a builder of many residential properties for many years. He had had negotiations for FHA loans, prior to the time when he met the Bartrons, for 58 houses in the same development. It is inconceivable that this experience would not have brought him in contact with the FHA procedure and regulations on the subject of financing down payments. His own testimony revealed this knowledge. In answer to a question as to whether the secondary financing would have been grounds for the refusal of the Bartron application for an FHA loan, he testified: "Well, there was to be no secondary papers, that is true. I know what you are arriving at."

Assuming, for the sake of argument, that Tice was ignorant of the requirements, such ignorance would constitute the type of incompetence contemplated by

clause (7) of §10(a) of the Real Estate Brokers License Act. His actions in endeavoring to induce the Bartrons to make misstatements in the forms which they were required to sign is conduct in connection with a real estate transaction which demonstrates incompetence, bad faith or dishonesty.

The court below construed our Real Estate Brokers License Act so that it would apply only to persons in connection with an agency transaction and would not apply to a person who was selling his own property. In our judgment, there can be no justification of an interpretation of the licensing act which would allow a broker to be honest as a broker and dishonest as a property owner. A broker who is dishonest or incompetent in the real estate activities in which he is involved as owner, is not likely to be honest or competent in his activities which are purely brokerage in nature. The purpose of real estate licensure is to bar the dishonest or incompetent from entry into this occupation: *Roman v. Lobe,* 243 N.Y. 51, 152 N.E. 461.

Our licensing law requires an individual broker applicant to furnish to the commission evidence of his "honesty, truthfulness and good repute." Section 7(b) of the Real Estate Brokers License Act, 63 PS §437(b).

Out of state cases have gone both ways on this subject. The courts of some states have rejected the double standard for persons in professional callings. See *In re Isaacs,* 172 App. Div. 181, 158 N.Y.S. 403, in which an attorney was disbarred for fraudulent conduct in a business venture. In that case the court said: "There seems to be no good reason why a lawyer should be allowed to be honest as a lawyer and dishonest as a business man. If he desires to go into business, he must take the risk, if any is involved, and must see that his dealings as a business man are as upright as should be his dealings in his professional capacity." See also the case of *Real Estate Commission v. Ponsi,* 39 N.J.S.

526, 121 A. 2d 555, in which the appellate division of the New Jersey Court said: "It seems from the examination of the statute that the advantageous object exhibited by its composition was to create and maintain a commission to scrutinize in general and with care the character, competency, and integrity of license applicants and license holders to the end that in the interest of the public welfare, incompetent, unworthy and unscrupulous persons would be excluded from the real estate brokerage business." See also *Maple Hill Farms, Inc. v. Division of the New Jersey Real Estate Commission,* 67 N.J. Super. 223, 170 A. 2d 461; *Middleton v. Division of the New Jersey Real Estate Commission,* 39 N.J. Super. 214, 120 A. 2d 789; *Anderson v. Florida Real Estate Commission,* 105 So. 2d 918; *Carter v. Florida Real Estate Commission,* 122 So. 2d 420.

In *Pritchett v. Florida Real Estate Commission,* 143 So. 2d 45, a case similar to the present case, the Florida District Court of Appeals said: "Anyone who deals with a licensed broker may assume that he is dealing with an honest and ethical person."

The courts of some other states have construed their statutes to confine the authority of the commission to activities in which the licensee has been engaged as a real estate broker. See *Blakeley v. Miller, Real Estate Commissioner,* 232 Iowa 980, 7 N.W. 2d 11, 13; *In the Matter of Dillingham,* 257 N.C. 684, 127 S.E. 2d 584; *Schomig v. Keiser, Real Estate Commissioner et al.,* 189 Cal. 596, 209 P. 550; *Robinson v. Missouri Real Estate Commission,* Mo. App., 280 S.W. 2d 138.

We believe that a single standard of honesty and competency should guide a broker's real estate activities whether performed as broker or owner.

Counsel for Tice also argues that the commission did not make specific findings of fact in its adjudication, as is required by the Administrative Agency Law, Act of June 4, 1945, P. L. 1388, as amended, 71 PS §1710.2.

Section 34 of the Administrative Agency Law, 71 PS §1710.34, provides: "All adjudications shall be in writing, shall contain findings and the reasons for the adjudication. . . ." Specific complaint is made that the commission made no findings that Tice knowingly misrepresented any matter to the Bartrons. While it might have been better had the commission made more specific findings of fact, we do not believe it necessary to remand the record for that purpose. The evidence is quite clear from which specific findings could have been made that Tice misrepresented matters to the Bartrons and it is also exceedingly clear that he made misrepresentations to the bank officer in connection with the application for the FHA mortgage. In its adjudication the commission, under the heading of "Discussion," stated: "Under such a mortgage, secondary financing is clearly illegal and Respondent knew or should have known this. Had Respondent not tried to evade this secondary financing prohibition, it is obvious that the agreement of sale would never have been signed for $14,700.00 and this dispute probably would not have occurred."

The evidence in this case, in our opinion, was entirely adequate to justify the commission's order revoking the real estate broker's license issued to Howard Tice.

The order of the court below is reversed and it is hereby ordered that the order of the State Real Estate Commission dated July 20, 1961 in this case be and it is hereby reinstated.

WRIGHT and WOODSIDE, JJ., would affirm on the opinion of the court below.